# Leonard v. Fox

476

*Samuel Roberts*, for claimant.

*Brooks, Curtze & Silin*, for defendant.

KITTS, J., October 9, 1936.—This is an appeal by defendant from an order of the Workmen's Compensation Board, which affirmed the award of compensation made by the referee. The essential facts found by the referee and approved by the board are substantially as follows:

On October 4, 1934, Arthur Leonard, claimant's decedent, was in the employ of defendant S. M. Fox. Fox was conducting a "walkathon" contest at 1916 State Street, Erie. Decedent was employed by him as a chef or cook at the walkathon. His hours of employment began at 7:30 p.m. and continued throughout the night. His weekly wage was $25. The employment had lasted for several weeks.

On the evening of October 4, 1934, decedent arrived at the walkathon at about 7 p.m. It appears that he had been feeling somewhat ill earlier in the day. This indisposition evidently continued after he reported for work.

Defendant maintained a hospital on the walkathon premises for the treatment of contestants rendered ill by their misguided efforts. The facilities of this hospital were equally available to employes. Two nurses were in attendance in successive shifts. It appears that decedent temporarily left his duties to go to this hospital for a remedy for his complaint. From the facts competently proven it may be inferred that he intended to take some mineral oil as a laxative. However, likewise standing on the medicine shelf in the hospital was a bottle of oil of wintergreen, remarkably similar to the bottle of mineral oil in size, shape, appearance and markings on the label. Both labels bore the legend "oil" in large letters, and "of wintergreen" and "mineral", respectively, in comparatively small letters. Evidently deceived by the resemblance, decedent poured some of the oil of wintergreen into a glass and drank its contents. The oil of wintergreen was intended for external use only, as a massage for the wilting muscles of fatigued contestants. Decedent promptly became violently ill and complained to the nurse in attendance. She summoned Dr. W. Richard McAtee, who treated decedent, but at midnight permitted him to go home. He died at his home four hours later. A post-mortem examination by three physicians resulted in the conclusion that death was due to acute poisoning caused by methyl salicylate contained in the oil of winter-

green, to which decedent's system was peculiarly sensitive.

As the walkathon evidently never remained in one place very long, and was nowhere near Erie when the widow's claim petition came before the referee for hearing, the case has obviously not been without its difficulties. A hearing was held in Erie. Subsequent efforts to subpoena defendant for hearings at Charlotte, N. C., and later at Richmond, Va., failed when defendant could not be found for service. The hearing at Richmond did produce the testimony of other employes of the walkathon. Additional hearings were then held in Erie. The referee then made an award of compensation to the widow for herself and three children. An appeal followed to the Workmen's Compensation Board. The parties argued the appeal before the board. Then, before the board had reached a decision, additional and very material testimony was taken before Commissioner Fitzgerald, one of the three members of the board, at the request of claimant, in the presence of, but over the objection of, counsel for defendant. The board then affirmed the findings of fact, conclusions of law and award of the referee, in an opinion written by Commissioner Fitzgerald and concurred in by his colleagues, which relies in part upon the additional testimony taken by the commissioner.

Defendant has filed 13 exceptions to the action of the board. While several of these assignments of error are general in terms, and each alleges more than one ground of error, they may be grouped as follows: The first and second exceptions attack the finding that decedent was employed by Fox; the third to sixth inclusive are aimed at the finding of the occurrence of an accident; the seventh contests the finding that the accident occurred in the course of decedent's employment; the eighth disputes the wage finding; the ninth and tenth challenge the admissibility of the additional testimony heard by Commissioner Fitzgerald; the eleventh, twelfth, and thirteenth are leveled at the conclusions of law which rest on the dis-

puted findings of fact. In short, defendant admits nothing but death and dependency.

Before disposing of these objections seriatim, it may be well to remind counsel of the principles which guide us under our appellate decisions. We are limited strictly to a consideration whether the record presents sufficient competent evidence to support the findings of fact made by the compensation authorities, together with the conclusions of law and award based thereon. We may not weigh the evidence, as the findings of fact made by the referee and the board are as binding upon us as the verdict of a trial jury, provided, as already stated, competent evidence supports those findings. That we might ourselves conceivably reach an opposite conclusion were we permitted to weigh the evidence in a compensation case, or that we might find the preponderance of the testimony contrary to the findings, is of no moment. If the findings are sufficiently supported by claimant's testimony of a competent character we may in effect ignore defendant's testimony entirely: Kuca v. Lehigh Valley Coal Co., 268 Pa. 163; Loeffler v. Western Electric Co., 107 Pa. Superior Ct. 326; Knisely v. Knisely et al., 120 Pa. Superior Ct. 140.

A careful examination of the testimony presented by claimant suggests immediately that much of it is hearsay and might have been objected to. Some of it was actually the subject of prompt objection by counsel for defendant, but much of the rest of it passed with a most belated objection, where one was entered at all.

In considering the findings in the light of the testimony, we are bound by the provisions of section 422 of The Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended by the Act of June 26, 1919, P. L. 642:

"Neither the board nor any referee shall be bound by the technical rules of evidence in conducting any hearing or investigation, but all findings of fact shall be based only upon competent evidence."

This provision was manifestly entered to relax rather than to narrow the restrictions upon the admission of evidence. That which may be received in a civil case is a fortiori admissible here. That which if objected to would be inadmissible as incompetent, if not objected to, becomes competent for all purposes. If counsel do not object and are content to try their case upon the basis of inherently inadmissible testimony, such testimony may be made the basis of a jury verdict in a civil case. We fail to see why a similar failure to object may not make such testimony equally competent for all purposes in a compensation case. We construe section 422 as being aimed at incompetent testimony improperly admitted over the timely objection of counsel. Where no timely objection is entered, the testimony constitutes as satisfactory a basis for a finding as if it were inherently admissible over objection.

The opinion of Justice Kephart in Poluski v. Glen Alden Coal Co., 286 Pa. 473, 475, 476, thus states the principle and its application:

"There is nothing in the evidence thus quoted or in the statements later made to his wife and son that would bring them within the res gestæ rule. The length of time intervening between the accident and the conversation at 11 o'clock does not appear. The finding of an injury in the course of employment is here sustained, not on the theory that the statements as to the accident and its cause were in fact part of the res gestæ, (Smith v. Phila. & Reading Coal & Iron Co., 284 Pa. 35; Riley v. Carnegie Steel Co., 276 Pa. 82), but because the evidence was admitted without objection as proof of these substantive facts. Under this state of the record, they must be treated as though counsel deemed them part of the res gestæ, or, if not, then that they were of sufficient probative value for the purpose intended—that is, to show a compensable case. Where evidence, incompetent as hearsay, is admitted without objection and is relevant and material to the fact in issue, the court may give it the

value of direct evidence and on it base a finding of fact; or it may be treated, by what may be taken as consent, as part of the res gestæ in determining the issue. 'A rule of evidence not invoked is waived': Wigmore, vol. 1, section 18. 'Inadmissible evidence, including hearsay evidence, admitted without objection, is not a nullity or void of probative force, but is to be given its natural probative effect as if it was in law admissible: 10 R. C. L. 1008. This is true even in a criminal case': Sawyer v. French, 290 Mo. 384, 235 S. W. 126, 130. See also Diaz v. U. S., 223 U. S. 442, 450, though the point discussed is more or less by way of dictum since in that case the evidence had been *introduced* by defendant who on appeal attacked its legality. See Damon v. Carrol, 163 Mass. 404, 408-9, and Forster v. Rogers, 247 Pa. 54, 63, followed in Keebler v. Land Title & Tr. Co., 266 Pa. 440, which by indirection sustains the point now discussed."

See also Johnston v. Payne-Yost Construction Co. et al., 292 Pa. 509; Wiltbank v. Fire Assn. of Phila. et al., 293 Pa. 206; Pataky v. Allen Motor Co. et al., 100 Pa. Superior Ct. 343; O'Boyle v. Harry Seitz & Sons, 105 Pa. Superior Ct. 135. The spirit of these decisions is summed up in the statement in the Johnston case that "while the record of every such [compensation] award must show it to be supported by competent proof, yet the rules of evidence are not applied in these cases with the same rigor as in litigation before a jury" (292 Pa. 574).

Excluding for the moment the testimony of the witness Levick taken by Commissioner Fitzgerald, in the light of the foregoing principles there was ample evidence, some originally competent, some rendered competent by failure to object, to support the findings. The testimony of the widow as to the employment by the defendant S. M. Fox, who conducted the walkathon, was not only not objected to by defendant but was actually brought out by counsel for defendant himself on cross-examination:

"Q. How did you get in touch with the walkathon?
. . . .

"A. We read in the Bill Board that Sam Fox was having a walkathon in Erie, Pennsylvania.

"Q. And you were not present when he made arrangements to go to work for them?

"A. No, I was not present.

"Q. You don't know with whom he made those arrangements?

"A. He told me he made them with Sam Fox. . . .

"Q. Had he been paid anything at that time?

"A. Mr. Fox gave him $14, which he said was part pay, and he would pay him the rest between the first week and the second week. . . .

"Q. How do you know that he got it?

"A. He brought it home and handed it to me.

"Q. And what did he tell you?

"A. He told me it was part payment and Mr. Fox had arranged to give him the rest of it between that and the following week.

"Q. Did he mention Mr. Fox's name?

"A. He did."

Since all of this was elicited by defendant's own questions after the witness had indicated she was not present at the transaction, defendant cannot complain, nor may he urge upon us the motion to strike out. Objections to questions asked by one party, and motions to strike out the answers as being unresponsive, must be timely. The rule is thus stated in 1 Wigmore on Evidence (2d ed.) §18:

"The general principle governing the time of the objection is that *it must be made as soon as the applicability of it is known* (or could reasonably have been known) *to the opponent*. . . .

"For evidence contained in a *specific question,* the objection must ordinarily be made *as soon as the question is stated,* and before the answer is given; unless the inadmissibility was due, not to the subject of the question, but to some feature of the answer."

For the complete statement of the rule in support of the above expression of it see Forster v. Rogers Bros., 247 Pa. 54.

In addition to this testimony by the widow there was additional testimony by various employes of the walkathon, as well as by the physicians and the coroner, all of whom testified that from the manner in which Fox and Leonard conducted themselves it appeared to them that the employer and employe relationship existed between them. All of these witnesses were scrupulously careful to admit that they had no direct statement from Fox that Leonard was his employe. However, admissions may arise out of conduct as well as out of express language. If Fox's every act with relation to Leonard was that of a person in authority by reason of the employment relationship, the fact that he failed to tell any of the witnesses that Leonard was his employe may not be material. Perhaps the testimony of these additional witnesses might in itself be insufficient to prove the relationship, but they do constitute helpful material out of which the entire structure of proof may in part be built.

To be added to the testimony of the employes of the walkathon and the physicians is the testimony of Mrs. O'Day, who rented an apartment to decedent shortly before his death. This testimony, although obviously hearsay from the very start of the material questions, was not challenged by counsel for defendant until after the direct examination was over and until counsel for defendant had himself completed his own cross-examination. Since defendant wishes to urge upon us a technical objection to the admission of testimony, he must himself comply with the proper rules and technicalities requisite to the presentation of that objection, as laid down in the excerpts from Wigmore on Evidence quoted above. It is a poor rule that does not work both ways: he who invokes a rule must himself comply with it. Under the circumstances, the following testimony of Mrs. O'Day becomes most material:

"Q. What did he [Mr. Leonard] tell you?
"A. That he worked for Mr. Fox and got $25 a week.
"Q. And where did he say he was working?
"A. At the marathon.

## "CROSS-EXAMINATION

"Q. He told you that at the time?
"A. He told me he worked for Mr. Fox at the marathon and was getting $25 a week and would be able to pay me next day."

Dr. McAtee, who was the attending physician at the walkathon, testified as follows:

"Q. Doctor, state, if you know, by whom Arthur Leonard was employed?
"A. Apparently Mr. Fox.

.    .    .    .    .    .    .    .    .

"Q. Mr. Fox was interested in this whole occurrence, the welfare of Leonard?
"A. Certainly.
"Q. State whether or not he seemed to consider it part of his responsibility to be the employer of Leonard?
"A. Yes, he appeared to be the employer of Leonard.

.    .    .    .    .    .    .    .    .

"Q. In that conversation with Mr. Fox, that was all following this occurrence?
"A. I talked with Mr. Fox and told him I was sending the boy to the hospital, and he immediately left for the hospital."

Similarly the cornoner, Dr. Stroble, testified as follows:

"Q. In the course of your investigation you say you talked with Mr. Fox. State whether or not he was the employer of Arthur Leonard?
"A. I did not ask him whether he was. It was my understanding he was.
"Q. That was based upon what you observed: Fox's action, conduct, et cetera?
"A. It was."

Even beyond these admissions by conduct, defendant S. M. Fox made even stronger admissions by similar conduct as to which testimony was given by William L. Holden, the mortician. He testified as follows:

"Q. With whom were arrangements made for shipping the body to Baltimore?

"A. S. M. Fox.

. . . . . . . . .

"Q. Who did you say called you?

"A. S. M. Fox. Mr. Fox was the man who did the business with me over at my place.

"Q. Mr. Fox came over and said, 'One of our boys had an accident.' Then Mr. Fox said he wanted this body shipped to Baltimore?

"A. He wanted the body prepared for burial and as reasonable as I could do it, and shipped to Baltimore.

. . . . . . . . .

"Q. The first you knew about it was when Fox came over and made arrangements?

"A. He selected the casket. I carry my own caskets.

. . . . . . . . .

"Q. $105 you received from whom?

"A. From Mr. Fox. $105.54.

"Q. In what way was this money paid to you?

"A. By Mr. Fox.

"Q. And you gave a receipt to Fox?

"A. Yes, on my billhead."

Making full allowance for the occasional generous gestures of mankind, Fox's attitude, in making full arrangements with the mortician for the funeral, in making payment of part of the funeral bill and in taking a receipt therefor, seems to confirm the impression that he was acting as the direct employer of decedent.

In further support of this proposition, claimant subpœnæd a letter in the possession of an agent of the insurance carrier. This letter purported to be written by the International Amusement Company, countersigned by S. M. Fox or by someone in his name, addressed to

the insurance carrier through its agent, which, after a reference to a specific policy number, read in part:

"Please take notice that Arthur Leonard, who was employed by us in the capacity of cook, met with an accident on the fourth day of October, 1934. As near as we get the story, Leonard intended to take some mineral oil, and by mistake took instead some oil of wintergreen."

Inasmuch as prompt and timely objection was made to the offer of this letter and its authorship was not fully proven we are not inclined to rest our decision upon the strength of its production, particularly in view of the mass of other evidence which properly proves the proposition for which the letter was offered.

We have thus far devoted no attention to the strongest evidence on the question both of employment and of decedent's wage. This is the testimony of the witness Levick as to admissions made directly to him by defendant, S. M. Fox, which testimony was received at the hearing before Commissioner Fitzgerald. Admittedly, if received before the referee, the competency of this testimony would be unassailable. Since the statements were made by a party to the proceeding they are admissible without showing any of the features which would be indispensable to declarations against interest which arise in the case of statements made by persons not parties to the proceeding. In urging the contrary proposition counsel for defendant is manifestly in error. The general proposition is thus stated in 2 Wigmore on Evidence (2d ed.) §1048:

"The statements made out of court by a party-opponent are universally deemed admissible, when offered against him . . . *anything said by the party-opponent may be used against him as an admission.* . . . It follows that the subject of an admission is *not limited to facts against the party-opponent's interest at the time* . . . that circumstance has no bearing on their admissibility."

The same authority points out, in §1049, that amongst the obvious distinctions between admissions of a party and declarations against interest is that the rule ap-

plicable to the latter, "that the declarant must first *be accounted for as deceased, absent* from the jurisdiction, or *otherwise unavailable,* has never been enforced for the use of a party's admissions". See also Abbott v. Walker et al., 204 Mass. 71; Guy v. Hall, 3 Murph. (N. C.) 150; Stewart v. Doak Bros., 58 W. Va. 172; Woolway v. Rowe, 1 Ad. & El. (Eng.) 114.

The admissions thus made by defendant Fox to the witness Levick, if the witness Levick is to be believed, and the question of his credibility was entirely for the compensation authorities and beyond our purview, were to the effect that decedent was in Fox's employ as a chef at the rate of $25 per week. There was further testimony to the effect that Levick had seen Fox's paymaster turning over decedent's pay to him. He had also seen decedent at work as a cook and waiter, setting the tables and arranging for the meals of the contestants. Undoubtedly, if this evidence was properly received, without any of the other evidence already quoted and referred to, it would be sufficient to prove the employment by Fox and the wage of $25.

However, counsel for defendant earnestly contends that while this testimony might be inherently admissible the entire hearing before Commissioner Fitzgerald was improper and the testimony taken by the commissioner a nullity. This view depends upon the argument that the entire case had been closed by the completion of the hearing before the referee, the appeal to the board and the argument before the board, so that no further testimony could be taken without an official order of the board remanding the proceeding on the basis of a formal petition for rehearing, or the requirements made manifest by testimony already on record which perhaps required clarification. Careful consideration of this argument convinces us that counsel for defendant has given insufficient weight to the peculiar position of the compensation authorities as a single unit or system. In article IV of The Workmen's Compensation Act of 1915, supra, relating to

procedure, the legislative intent is shown to regard the Workmen's Compensation Board not merely as an appellate body but as the primary compensation authority for all compensation matters, with the right to refer the taking of testimony and subsequent action thereon to referees for the convenience of, and as agent for, the board. The central provision of this system is that of section 414, which, as amended, provides:

"Whenever a claim-petition or other petition is presented to the board, the board shall, by general rules or special order, either direct it to be heard by the board or assign it to a referee for hearing: Provided, however, That petitions presented under section four hundred and eleven and four hundred and twelve shall be heard by the board."

Furthermore, the board maintains the most flexible control over the disposition of a case at all times. Thus, under section 415:

"At any time before an award or disallowance of compensation or order has been made by a referee to whom a petition has been assigned, the board may order such petition heard before it or may reassign it to any other referee. Unless the board shall otherwise order, the testimony taken before the original referee shall be considered as though taken before the board or substituted referee."

Section 419 further illustrates the likeness of the referee in a workmen's compensation case to a master specially appointed by a court for its own convenience to aid the court by taking testimony. That section provides:

"The board may refer any question of fact arising under any petition, including a petition for commutation heard by it, to a referee to hear evidence and report to the board the testimony taken before him or such testimony and findings of fact thereon as the board may order. The board may refer any question of fact arising out of any petition assigned to a referee, to any other referee to hear evidence, and report the testimony so taken thereon to the original referee."

Finally, the provisions relating to appeal and subsequent procedure indicate clearly that it is the board which is the jury as well as the judge in workmen's compensation. It may make new findings of fact upon the evidence already submitted to it through the hearing before the referee, disregarding the findings and conclusions reached by the referee, or it may take additional testimony itself and thereafter reach independent conclusions. As pointed out in section 423:

"In any such appeal the board may disregard the findings of fact of the referee, and may examine the testimony taken before such referee, and if it deem proper may hear other evidence, and may substitute for the findings of the referee such findings of fact as the evidence taken before the referee and the board, as hereinbefore provided, may, in the judgment of the board, require, and may make such disallowance or award of compensation or other order as the facts so found by it may require."

Similarly, under section 424:

"As soon as may be after any such hearing, the board shall either sustain or reverse the referee's award or disallowance of compensation, or make such modification thereof as it shall deem proper."

The further power of the board to take additional testimony within its discretion, either in the form of a hearing de novo or a rehearing, is indicated in section 425 and 426 as follows:

". . . the board may, in its discretion, grant a hearing de novo before the board or assign the petition for rehearing to any referee designated by it or sustain the referee's award or disallowance of compensation".

"The board, upon petition of any party and upon cause shown . . . may grant a rehearing of any petition upon which the board has made an award or disallowance".

The sweeping powers to take additional testimony or to refer a proceeding to a referee for the taking of additional testimony, and in either event itself to make new findings of fact, conclusions of law and final disposition, places the

board in a position totally different from that of an ordinary appellate court. Its action in having the additional testimony of the witness Levick, taken before Commissioner Fitzgerald, constitutes in effect the granting of a hearing de novo under section 425. Whereas, under section 426, a petition for rehearing "of any petition upon which the board has made an award or disallowance . . . or ruling" requires "cause shown", no such provision appears in section 425, which relates to the taking of testimony by the board before it has itself acted upon the appeal before it. Consequently, the action of the board in this case in taking the testimony of Levick at what amounted to a hearing de novo required no formal petition for rehearing to support it. While to us it might seem wiser and a safeguard to the board to require such a petition, to avoid hearings where no new constructive evidence would be offered, we cannot say that the board exceeded its powers under the statute by taking the testimony without such a formal petition.

That the compensation system of board and referee is in effect a unit, permitting the board to take additional testimony after the referee has acted, is indicated by the spirit of the opinion in Manley v. Lycoming Motors Corp., etc., 83 Pa. Superior Ct. 173, in which our Superior Court, through Judge Keller, said at page 174:

"In disposing of the question it must be borne in mind that the Workmen's Compensation Board is not a court and a proceeding under the act creating it is not 'litigation' to which established rules and principles of common law practice are applicable: Gairt v. Curry Coal Mining Co., 272 Pa. 494, 498. If the necessary authority has been conferred upon the board, it is not restricted in its action by terms or return days, but may grant a rehearing when the interests of justice require it, within such general limitation as may be imposed by the act. And it is the duty of courts to construe the act liberally, as respects the claimant's right to compensation, having in mind the benevolent and humanitarian purposes of its enactment:

Gairt v. Curry Coal Mining Co., supra, p. 498; Blake v. Wilson, 268 Pa. 469, 474; Callihan v. Montgomery, 272 Pa. 56, 59; Clark v. Clearfield Opera House Co., 275 Pa. 244, 246. . . .

"The referee is simply the agent of the board; his findings and awards or disallowances are not made direct to the parties but are filed with the Workmen's Compensation Bureau (sec. 404) in accordance with the rules and regulations of the board, and copy thereof served by it upon the parties in interest; and the referee's report and award, unappealed from, is considered the action of the board, just as the entry of judgment by the prothonotary for want of an affidavit of defense is on behalf of the court, or the report of an auditor to which no exceptions have been filed is considered as the action of the court. This is clearly the case, for by section 414 (amendment of 1919) it is provided that the board may either refer claim petitions to a referee or hear them itself, except that hearings where the parties agree on the facts, but fail to agree on the compensation payable thereunder (section 411) and on petitions for commutation, (section 412) must be had before the board."

In Greeby v. Philadelphia Asbestos Co. et al., 120 Pa. Superior Ct. 9, 12, the Superior Court said, in an opinion by Judge Baldrige:

"One of the purposes of the workmen's compensation laws is to give a claimant full opportunity to present whatever competent evidence he desires to reach the merits of the case. In harmony with this liberal tendency, the courts have held that the board has broad powers to grant a rehearing when justice requires: Kocher v. Kocher et al., 300 Pa. 206, 150 A. 468; Manley v. Lycoming Motors Corp., 83 Pa. Superior Ct. 173; Fedak v. Dzialdowski, 101 Pa. Superior Ct. 346."

A more serious objection might possibly be that the testimony was taken before a single commissioner instead of the entire board, without stipulation of the parties. Throughout the act reference is made to hearings before

"the board," which would seem to suggest a board of three, or at least a quorum of two members. However, this error, if error it was, is cured by two factors: In the first place, counsel for claimant, before the commencement of that hearing, entered a stipulation on the record that the "testimony presented before the commissioner may be considered by the board with the same force and effect as though this testimony had been offered before the referee." To this, defendant entered no objection. Shortly thereafter, after the witness had been sworn, counsel for defendant objected to the taking of the testimony of the witness, but only on the single ground that "the testimony was closed before the referee . . . that before any testimony of this witness, or any other witnesses, can be given, a petition for a rehearing must be filed." In other words, defendant's objection was not to the taking of testimony by a single commissioner in the place of the entire board, but rather to the taking of testimony at all by anyone at this stage of the proceeding without the filing of a formal petition for rehearing. If this specific objection cannot be sustained, the fact that defendant might have presented another objection which would have been sustainable cannot now be of any avail to him. As stated in 1 Wigmore on Evidence (2d ed.) 185, §18:

"A specific objection *overruled* will be effective to the extent of the grounds specified, and no further. An objection overruled, therefore, naming a ground which is untenable, cannot be availed of because there was *another and tenable ground which might have been named* but was not".

The same principle is thus stated by Chief Justice Gibson, in Wolverton et al. v. Commonwealth, for the use, 7 S. & R. 273, 277:

"In like manner, a party may be called on to state the particular ground on which he rests an objection to competency, and if it fails him, it is not error to receive the evidence, although it be incompetent on other grounds. Where, therefore, there is a special objection, or, what

is the same in effect, a general objection resting not on collateral circumstances, but on the supposed existence of an abstract principle admitting of no exception, as was the case here, every ground of exception which is not particularly occupied, is to be considered as abandoned. For instance: a deposition is offered, and it is resisted exclusively on the ground, that the witness is interested, or that the evidence is irrelevant; would it not be palpably unjust in a Court of error to listen to an objection, that it did not appear there had been proof of notice, or that the deposition had in all respects been regularly taken? If the defect were pointed out in time, it might be supplied by further proof; or if that were impossible, the party would at least be apprised of the danger to ultimate success, which is necessarily incurred by pressing the admission of incompetent testimony. Here, if instead of urging the abstract operation of the rule, the defendants had objected, that the case did not fall within the particular exception to it, now relied on, the plaintiffs might have been prepared to shew that the execution actually came to the hands of the Sheriff, or that it was lost or destroyed; but, as to that, the silence of their antagonists at the trial, had a direct tendency to lead them into a surprise."

Consequently, while defendant might properly have objected (but as to this we make no ruling) that the testimony should have been heard by the three members of the board rather than by one sitting alone, he failed to present any objection on that ground and so waived that defect, if defect it be. From the practical viewpoint, if the board may refer this proceeding to an individual referee for the taking of additional testimony, as provided by the statutory provisions already quoted, we fail to see why the board might not, even in the absence of an express stipulation, refer the proceedings for the same purpose to a single commissioner, whose dignity rises higher than that of the referee. And, if that action should have been taken by a formal order of the board which, from all that appears to us, seems to have been lacking, the deficiency

was repaired in effect by ratification by the board of the action of the individual commissioner. The board of three members wrote an opinion through the commissioner who heard the testimony. That opinion was concurred in by the commissioner's two colleagues. This constitutes a complete ratification of that which we believe the board might previously have authorized, viz., the taking of additional testimony by the commissioner sitting alone.

It is true that the board might have waited for a petition for rehearing, an answer to the petition, heard argument on the petition, considered briefs and then finally remanded the proceeding to a referee or referred it to a member of the board for hearing. However, we see no merit in adopting so involved a procedure with its inevitable delays, particularly in a compensation case where the step taken was merely interlocutory in permitting the taking of additional testimony. Justice delayed is justice denied. In view of the fact that decedent passed away on October 4, 1934, and the record was still incomplete on February 18, 1936, a year and a half thereafter, the taking of the testimony on that date by the individual commissioner was perhaps to be commended rather than criticized. In compensation matters particularly, the cutting of Gordian knots in favor of speedy termination of contests is to be favored where the substantive rights of the party are given a fair opportunity of expression.

Under the circumstances, the testimony of the witness Levick was fully competent, properly received and in itself would be sufficient to sustain the finding that decedent was employed by defendant at a wage of $25 per week. This disposes of the first and second exceptions relating to the employment, the eighth exception relating to the wage finding, and the eleventh exception directed at the first conclusion of law made by the referee that decedent and defendant were bound by The Workmen's Compensation Act.

However, while it is unnecessary to our decision, we note with interest that there is sufficient on the record,

provided by both claimant and defendant's witnesses, to suggest that defendant Fox must be held to be decedent's statutory employer as a matter of law even in the absence of a direct employment by him of decedent. Fox operated a walkathon or dance marathon in the course of which unfortunate contestants struggled around the floor as long as their endurance would permit, having their strength bolstered in the meantime by refreshments provided for them by Fox as the operator of the walkathon. Provision for food for these contestants was an indispensable part of the walkathon. The testimony in the case is undisputed that part of decedent's work was to prepare and serve the food to the contestants to maintain their strength at a point where they might continue on for the amusement of the spectators and the further profit of the operator of the walkathon. It is defendant's contention that Fox had granted the food concession by contract to a party named Orrich, and that decedent worked for Orrich rather than for Fox. If so, the provision of food for contestants was still part of Fox's regular business in maintaining the walkathon, but was entrusted to the independent contractor Orrich, who in turn hired Leonard as an assistant. We have chosen these words to designate the relationship of the parties, because they most aptly indicate the resultant application of section 302(b) of The Workmen's Compensation Act, which provides, in part:

". . . an employer who permits the entry, upon premises occupied by him or under his control, of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to that employe or contractor, shall be conclusively presumed to have agreed to pay to such laborer or assistant compensation in accordance with the provisions of article three".

This provision must be read in accordance with the provision of section 105 which provides:

"The term 'contractor' as used in article two, section two hundred and three, and article three, section three hundred and two (b), shall not include a contractor engaged in an independent business, other than that of supplying laborers or assistants, in which he serves persons other than the employer in whose service the accident occurs, but shall include a sub-contractor to whom a principal contractor has sublet any part of the work which such principal contractor has undertaken."

We believe that under these provisions Fox would be liable as a statutory employer under the provisions of section 302(b) even though he were not in fact the direct employer of Leonard: Byrne v. Henry A. Hitner's Sons Co., 290 Pa. 225; Qualp v. James Stewart Co., Inc., et al., 266 Pa. 502. However, since there is sufficient competent evidence to support claimant's award on the basis of the present finding made by the referee, we shall not remand the proceeding for further testimony to clarify this phase of the case, but, in passing, simply point out that even defendant's version of the fact would apparently lead to liability on the part of Fox.

We now turn to the third to sixth exceptions, inclusive, in which defendant objects to the finding that decedent met with an accident. There is unobjectionable testimony that the appearance of the bottles of oil of wintergreen and mineral oil was very similar, and that after Leonard had been to the hospital the oil of wintergreen was found off the shelf with a glass, and with apparently a glassful of its contents removed from the bottle. There was further testimony, which might not properly be characterized as res gestæ, as to statements made by Leonard to those around him an undefined length of time after the consumption of the oil of wintergreen. Some of this testimony was not objected to and, as such, under the principles already discussed, is competent to support the referee's finding. Beyond this, there is the direct testimony of Dr. McAtee as to a statement made to him by decedent. This testimony is as follows:

"Q. In the course of your treatment, did you get a history of his condition from Leonard that evening?

"A. Yes, I did get a history.

"Q. What did he tell you?

"A. He said he had not been feeling very well that day and had taken some aspirins before he left home, and he came to the walkathon and thought he would take some American oil for his bowels, and he took half a glass of what he supposed to be American oil. He noticed it had a wintergreen taste and he began to vomit. After a time he reported it to the nurse and the nurse called me."

This evidence was competent. In John v. Reick-McJunkin Dairy Co., 281 Pa. 543, 547, a negligence case, the Supreme Court said:

"The evidence objected to included the testimony of the physician as to facts given him by the patient constituting a history of the latter's condition upon which he based his opinion as to plaintiff's physical ailment and prescribed the treatment to be given. This evidence was properly received: Lichtenwallner v. Laubach, 105 Pa. 366, 370; Lakeshore and Michigan Southern R. R. v. Rosenzweig, 113 Pa. 519, 543."

This case was followed in the compensation decision by the Superior Court of Pataky v. Allen Motor Co. et al., 100 Pa. Superior Ct. 343, in which the court said at page 345:

"As to the statement made by decedent to the doctor there seems to be no doubt as to its competency. When Pataky told the doctor that the gas made him sick, the doctor had a right to repeat such statements as part of the history of the case".

If decedent drank the oil of wintergreen by mistake, assuming it to be something else, that was an accident.

The question whether swallowing harmful chemicals by mistake is an accident has apparently not been passed upon by our appellate courts. In Israel v. Brisgol Bros., etc., 104 Pa. Superior Ct. 16, a drugstore employe swallowed, not one, but two lethal acids, and the case was obviously one of suicide. But the language of the Superior

Court, in referring twice to the fact that all factors showed that this could not have been a "mistake", suggests that, had the case been one of mistake, it would have been held an "accident".

In Yawkey-Bissell Lumber Co. et al. v. Industrial Comm. et al., 215 Wis. 99, 253 N. W. 793, facts very similar to those now before us were held to present a compensable accident under the Wisconsin act. A clerk at a logging camp was in charge of the camp store "for selling to its employees clothing and tobacco, and also medicines used by them for self-medication. The clothing was kept on certain shelves and at one end thereof the medicines were kept. On the opposite end of the shelves, behind some overalls, a bottle of carbolic acid was kept . . . he intended, apparently, to take some castor oil for . . . dysentery. However, instead he took carbolic acid by mistake, and died within twenty minutes". The court affirmed the award of compensation because "the carbolic acid was taken by mistake instead of castor oil", and this was an "unintentional, accidental occurrence of a mistake in self-medication".

In Archibald v. Workmen's Compensation Commr., 77 W. Va. 448, the following occurrence was held to be an "accident": Decedent was working as a plumber on a construction operation. As the city water piped into the building was unsatisfactory, the employes supplied themselves with drinking water from a neighboring well by means of buckets and bottles. Decedent, while working, drank from one such bucket, evidently unaware of the card on the bucket which read "poison". The bucket actually contained a poisonous fluid used for hardening concrete, and decedent died from the effects shortly thereafter. As the Supreme Court of Virginia remarked at pages 452-453: "Archibald, by mistake, drank this fluid for water . . . his death was thus accidentally occasioned. . . . Hence Archibald's fatal mistake in that incident of his service was legally the same as any injurious mistake he might have made in any act of direct service."

The West Virginia precedent was cited and followed under very similar facts by the Supreme Court of Massachusetts in Osterbrink's Case, 229 Mass. 407, in which compensation was awarded. There a door-tender kept a bottle of water under a tank on the floor of the cooling room of the packing plant where he was employed. The court further stated the facts at page 409:

". . . deceased went into the cooler, took a bottle from under the tank and drank from it. The bottle contained muriatic acid, and the injury that followed the draught resulted in the death of the deceased. The deceased mistook the bottle containing muriatic acid, which he took from under the sink . . . in or near the same place."

The same conclusion was reached in Elson v. Morhen Inn, Inc., 150 Misc. 540, 269 N. Y. Supp. 645, which was an action at law. There plaintiff was a musician employed by defendant inn. As part of his remuneration a meal was served him during such evenings as he was employed. While partaking of his meal plaintiff ate a portion of chocolate pudding which, unknown to all concerned, contained several pieces of glass. Although claimant had intentionally eaten the contents of the dish set before him he did so under mistake as to its true nature. Hence his injury was due to an "accident", and the common-law action was dismissed; since an accident had occurred he was entitled to workmen's compensation and hence could not bring an action at law.

The only alternative to a finding that Leonard took the oil of wintergreen by mistake is to assume that he intended to commit suicide or otherwise intentionally inflict an injury upon himself. As to this section 301 provides "that no compensation shall be made when the injury or death be intentionally self-inflicted, but the burden of proof of such fact shall be upon the employer." The burden of proof of suicide is one which the employer in this case has made no attempt whatsoever to meet, and it must therefore be excluded from consideration: Ford v. A. E. Dick Co., 288 Pa. 140; Laraio v. Pennsylvania R. R.

Co., 277 Pa. 382; Flucker v. Carnegie Steel Co., 263 Pa. 113. The finding of the occurrence of an accident is justified under all the evidence.

We come now to the seventh exception, in which defendant contends that this accident, if it be an accident, was not suffered in the course of decedent's employment. Under section 301:

"The term 'injury by an accident in the course of his employment,' as used in this article, shall not include an injury caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment; but shall include all other injuries sustained while the employe is actually engaged in the furtherance of the business or affairs of the employer, whether upon the employer's premises or elsewhere, and shall include all injuries caused by the condition of the premises or by the operation of the employer's business or affairs thereon, sustained by the employe, who, though not so engaged, is injured upon the premises occupied by or under the control of the employer, or upon which the employer's business or affairs are being carried on, the employe's presence thereon being required by the nature of his employment."

Was decedent in the course of his employment at the moment in the walkathon hospital when he mistakenly drank the oil of wintergreen? The evidence is undisputed that the hospital was part of the premises of the walkathon, intended for the use of employes as well as for contestants. Resort to it for a purpose intended by the employer did not take decedent from the premises of the employer, nor did this brief errand constitute an abandonment of the employment. Instead it represented "an innocent or inconsequential departure from the place of duty": Hunter v. American Steel & Wire Co., 293 Pa. 103; Shoffler v. Lehigh Valley Coal Co., 290 Pa. 480. As stated in Dzikowska v. Superior Steel Co. et al., 259 Pa. 578, 582:

"Acts of ministration by a servant to himself, such as quenching his thirst, relieving his hunger, protecting himself from excessive cold, performance of which while at work are reasonably necessary to his health and comfort, are incidents to his employment and acts of service therein within the workmen's compensation acts, though they are only indirectly conducive to the purpose of the employment. Consequently no break in the employment is caused by the mere fact that the workman is ministering to his personal comforts or necessities, as by warming himself, or seeking shelter, or by leaving his work to relieve nature, or to procure drink, refreshments, food, or fresh air, or to rest in the shade."

See also Blouss v. Delaware, Lackawanna & Western R. R. Co., 73 Pa. Superior Ct. 95; Hale v. Savage Fire Brick Co., 75 Pa. Superior Ct. 454; Waite v. Pittsburgh Limestone Co., 78 Pa. Superior Ct. 7.

In taking what he thought was mineral oil, decedent was obviously ministering to himself in a manner which was reasonably necessary to his health and comfort and would enable him to continue at work. This act of medication was entirely within the spirit of the group of permitted acts referred to in Dzikowska v. Superior Steel Co. et al., supra. No serious break in employment was necessary to the act, nor was the purpose of the employment abandoned nor any serious violation of orders involved. Decedent was obviously within the course of his employment at the moment of the accident.

We have already disposed of the eighth exception, relating to the wage finding, and the ninth and tenth exceptions, dealing with the admissibility of the testimony of the witness Levick heard by Commissioner Fitzgerald. The eleventh, twelfth and thirteenth findings deal with the conclusions of law founded upon the findings of fact. If the findings of fact are proper, and we have found that there is competent testimony to sustain them, they furnish a proper support for the conclusions of law and the award.

*Order*

And now, to wit, October 9, 1936, the exceptions are dismissed, the award of the Workmen's Compensation Board is hereby affirmed, and judgment is entered for claimant against defendant.

From Burton R. Laub, Erie.